UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LaKISSIUA A. REAMS,

   *Plaintiff*,

v.                                        CASE NO. 12-CV-14269

COMMISSIONER OF                  DISTRICT JUDGE BERNARD A. FRIEDMAN
SOCIAL SECURITY,                    MAGISTRATE JUDGE CHARLES E. BINDER

   *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

### II.   REPORT

#### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability, Disability Insurance ("DIB") benefits, and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 14.)

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Plaintiff LaKissiua Reams was 39 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 62.) Plaintiff's employment history includes work as an assistant manager at a restaurant for three years, as a cashier for one year, and as a shift manager at a restaurant for four years. (Tr. at 190.) Plaintiff filed the instant claims on October 31, 2008, alleging that she became unable to work on January 1, 2008. (Tr. at 158, 165.)[2] The claims were denied at the initial administrative stages. (Tr. at 96, 97.) In denying Plaintiff's claims, the Commissioner considered affective disorders and asymptomatic HIV infection as possible bases for disability. (*Id.*) On July 7, 2010, Plaintiff appeared before Administrative Law Judge ("ALJ") John J. Rabaut, who considered the application for benefits *de novo*. (Tr. at 35-57, 58-95.) In a decision dated September 20, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 53.) Plaintiff requested a review of this decision on November 8, 2010. (Tr. at 34.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 21, 2012, when, after review of additional exhibits[3] (Tr. at 8-34, 248-254, 553-613), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-7.) On September 26, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

---

[2]The alleged onset date was amended to October 16, 2008 during the hearing. (Tr. at 65.)

[3]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability"). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely

because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

**C.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq*. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken

4

adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden

5

transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.     ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through June 30, 2011, and that she had not engaged in substantial gainful activity since October 16, 2008, the alleged onset date. (Tr. at 40.) At step two, the ALJ found that Plaintiff's rheumatoid arthritis, asthma, bronchitis, cervical radiculopathy, fibromyalgia, obesity with osteoarthritis of knees, HIV positive, adjustment disorder and antisocial personality disorder were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 41-42.) At step four, the ALJ found that Plaintiff could not perform any past relevant work. (Tr. at 52.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual, i.e., between the ages of 18 and 44. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 43-51.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 53.)

**E.     Administrative Record**

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was treated at the Grand River Health Center from September 2007 through November 2008. (Tr. at 307-18.) Plaintiff was also treated by Larry Weiss, D.P.M., from November 2007 through November 2008 for foot pain. (Tr. at 319-24.) She was treated at the Henry Ford Health System from January to October 2008 (Tr. at 276-306), and at the University Physician Group from February to October 2008. (Tr. at 255-75.)

Plaintiff sought treatment on January 10, 2008, for "lower extremity pain." (Tr. at 297-98.) It was noted that Plaintiff had complete range of motion in both knees, that she had "mild tenderness" in her right knee, and "mild tenderness" in her right and left plantar aspect, but that all neurovascular areas were intact. (Tr. at 298.) It was recommended that Plaintiff "[c]ontinue current medications." (*Id.*)

Plaintiff sought treatment on May 18, 2008 for a "cough and sinus pain[,]" she was told to drink plenty of fluids, was given Amoxicillin and Flonase and was discharged home. (Tr. at 293-94.) Plaintiff sought treatment for a "cough" on May 25, 2008, was diagnosed with bronchitis, was given an inhaler and prescription for Prednisone and was discharged home. (Tr. at 289-90.)

Plaintiff sought treatment for "weakness" on October 19, 2008; CT scans of her head were normal. (Tr. at 285-86.) Plaintiff sought treatment on October 24, 2008, for "mild global headache, sore throat with difficulty swallowing, fevers/chills, diffuse body aches, nausea but no vomiting." (Tr. at 278, 304.) After a "strep screen" was negative, it was recommended that Plaintiff take Tylenol and she was discharged. (Tr. at 281.)

Plaintiff sought treatment in the emergency room on November 28, 2008, for lower extremity pain, x-rays taken of her left knee and left hip were "unremarkable[,]" and Plaintiff was discharged home. (Tr. at 442-50.)

Plaintiff was examined by Euriko Torrazza, M.D., on December 29, 2008, for knee and left hip pain. (Tr. at 325-30.) Dr. Torrazza noted that Plaintiff had "no inflammatory signs on her joints[,]" that her strength was "5/5/ all muscle groups," that she was "[a]lert and oriented x3," and that "cranial nerves II to Xii [were] intact." (Tr. at 327.) Dr. Torrazza assessed "[a]rthritis of both knees" and stated that "[l]ikely mechanical pain possibly related to obesity and HIV as well. Also left trochanteric pain likely mechanical." (Tr. at 327-28.)

Plaintiff underwent a consultative mental status examination with Nick Boneff, Ph.D, of the Sierra Medical Group on January 3, 2009. (Tr. at 331-37, 338-47.) Plaintiff reported that she had last worked in 2005 at Burger King for nine months and was fired because "there was a theft at the store, and she had not disclosed a prior conviction on her job application." (Tr. at 332.)

Plaintiff also reported that she had no history of psychiatric hospitalization and had started outpatient therapy in 2008. (Tr. at 333.) Dr. Boneff noted that Plaintiff "answered questions in a logical, goal-directed fashion for the most part." (Tr. at 334.) Plaintiff reported that she did not hear voices before but now is hearing "her own voice, but in two different tones." (*Id.*) Dr. Boneff diagnosed adjustment disorder with depressed mood and antisocial personality disorder, assessed a GAF score of 50, and gave a "fair prognosis[[.]]" (Tr. at 335.)  Dr. Boneff also opined that Plaintiff "would seem to be capable of engaging successfully in work-type activities at her level of cognitive complexity." (*Id.*)

Plaintiff also underwent a consultative examination with Cynthia Shelby-Lane, M.D., on January 3, 2009. (Tr. at 339-42.) Dr. Shelby-Lane noted that Plaintiff was alert and oriented x3 and answered questions "fairly well." (Tr. at 340.) Dr. Shelby-Lane noted that Plaintiff was "able to get on and off the table without difficulty" and that Plaintiff's "[t]andem walk, heel walk and toe walk" were "done slowly." (Tr. at 341.)  It was also noted that Plaintiff could "squat to 50% of the distance and recover and bend to 60% of the distance and recover[,]" that her "[g]rip strength is equal bilaterally," that "gross and fine manipulation appear bilaterally intact[,]" that "[a]bduction of the shoulders is 0-150[,]" that "[f]lexion of the knees 0-130[,]" "[s]traight leg raising while lying 0-50, [and] while sitting 0-90." (*Id.*)  Plaintiff's neurological exam was normal, sensory functions were noted to be "[i]ntact to sharp and dull gross testing" and that her motor exam "[r]eveals fair muscle tone without flaccidity, spasticity or paralysis." (*Id.*) Dr. Shelby-Lane opined that Plaintiff was "able to occasionally lift and carry 10 to 15 pounds[,]" to "stand or walk about two hours in an eight-hour day[,]" to "sit about six hours in an eight-hour day[,]" and to "do simple grasping, reaching, pushing, pulling and fine manipulation," but "would have difficulty operating foot and leg controls." (*Id.*)

Plaintiff was treated at the University Women's Care Clinic from February 2008 to March 2009 for stress. (Tr. at 356-63.) It was noted that Plaintiff was "[v]ery active with kids' school activities[,]" that Plaintiff's thoughts were logical and coherent, she was fully oriented, her affect was appropriate, her mood was anxious, her short-term memory was intact, her judgment was

8

good, her insight was good, and her intellectual functioning was average. (Tr. at 358-59.) Plaintiff was assessed with mood disorder due to medical condition, i.e., degenerative arthritis pain, and adjustment disorder with anxiety; she was assessed a GAF score of 63 and was referred to J. Bell for psychotherapy. (Tr. at 359.)

X-rays taken of Plaintiff's hip and knee joints on January 26, 2009 were "negative." (Tr. at 390.)

Plaintiff sought treatment in the emergency room on March 22, 2009, for flank pain. (Tr. at 431.) A CT scan of the abdomen and pelvis was normal; Plaintiff was advised to continue current medication and was discharged home in stable condition. (Tr. at 432-33.)

A Case Analysis was completed by Yolanda S. Young, specialty single decision-maker, on March 25, 2009, and concluded that Plaintiff was not disabled. (Tr. at 364-65.)

A Psychiatric Review Technique was completed on March 25, 2009, by Kokila Sheth, M.D. (Tr. at 366-79.) Dr. Sheth diagnosed affective disorders, i.e., Depressive Disorder, NOS, and Mood Disorder due to general medical condition.(Tr. at 366, 369.) Dr. Sheth concluded that Plaintiff was moderately limited in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence or pace. (Tr. at 376.) However, Dr. Sheth also concluded that Plaintiff retains the mental functional capacity to do simple, unskilled work on a sustained basis. (Tr. at 378.)

A Mental Residual Functional Capacity ("RFC") Assessment was completed by Dr. Sheth on March 25, 2009. (Tr. at 380-83.) Plaintiff was found to be moderately limited in her ability to understand and remember detailed instructions and her ability to maintain attention and concentration for extended periods but was otherwise not significantly limited in understanding, memory or sustained concentration and persistence. (Tr. at 380-81.) Plaintiff was also found to be moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors but was otherwise not significantly limited in social interaction. (Tr. at 381.) Dr. Sheth also concluded that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but was otherwise not significantly limited in adaptation. (*Id.*) Dr.

9

Sheth again concluded that Plaintiff retains the mental functional capacity to do simple, unskilled work on a sustained basis. (Tr. at 382.)

A Physical RFC Assessment was completed by Muhammad Mian, M.D., on February 12, 2009. (Tr. at 348-55.) Dr. Mian concluded that Plaintiff is able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. at 349.) Dr. Mian also found that Plaintiff should only occasionally balance, stoop, kneel, crouch, crawl or climb ladders/ropes/scaffolds, but could frequently climb stairs. (Tr. at 350.) No manipulative, visual or communicative limitations were established. (Tr. at 351-52.) Dr. Mian also concluded that Plaintiff should avoid concentrated exposure to fumes, odors, and gases, but had no other environmental limitations. (Tr. at 352.)

Plaintiff sought treatment in the emergency room on June 17, 2009, for paresthesia which she stated "started weeks ago and is still present." (Tr. at 424.) All examinations were normal, Plaintiff was advised to continue current medications and was "[d]ischarged home in improved condition."

A medical report was completed on October 28, 2009, by J. Patricia Dhar, M.D. (Tr. at 384-85.) Dr. Dhar noted that Plaintiff "complains of pain all over for the last year with insomnia" and that she "has a lot of stress[,]" noting that she has three children and "is a full time student in forensic science and that it is stressful." (Tr. at 384.) Dr. Dhar noted that Plaintiff had "[f]ull range of motion of all the joints" but was "[e]xquisitely tender all over muscles and joints." (Tr. at 385.) Dr. Dhar diagnosed fibromyalgia and referred Plaintiff to Dr. Lustig for "fibromyalgia rehab program." (*Id.*)

On January 27, 2010, Plaintiff sought treatment in the emergency room for an anxiety attack. (Tr. at 396.) Chest x-rays and an EKG were normal; Plaintiff was given a prescription for

10

Zantac[4] from Dr. William Lusk, D.O., and was discharged to home in good condition. (Tr. at 398-402, 411-15.)

Beginning in April 2010, Plaintiff's pain was managed with prescription drugs by the Wayne State University ("WSU") Physician Group. (Tr. at 392-95.) Plaintiff also sought treatment in the emergency room on May 16, 2010, for cough, fever, and chills. (Tr. at 416-19.) Plaintiff was advised to drink plenty of liquids, take her prescription medication and was discharged to home in stable condition. (Tr. at 419.)

Plaintiff was also treated by Dr. Robert MacArthur from the WSU infectious disease department for HIV. (Tr. at 452-73.) In addition, Plaintiff was treated by Jesse Bell, Ph.D., for depression and anxiety. (Tr. at 474-552.) Dr. Bell consistently noted that Plaintiff's judgment and insight were good, her memory was intact, and her thoughts were logical and coherent. (*Id.*) Dr. Bell opined that Plaintiff's "panic attacks appear related to repressed anger at her current boyfriend who is a father figure." (Tr. at 485.)

On April 2, 2009, Plaintiff was assessed a GAF score of 60. (Tr. at 494.) On September 10, 2009, Plaintiff was assessed a GAF score of 70 and it was noted that the past year's low score was 53. (Tr. at 490.) On May 27, 2010, Plaintiff was assessed a GAF score of 67. (Tr. at 531.) On June 14, 2010, Plaintiff was assessed a GAF score of 70. (Tr. at 534-35.) On June 28, and July 26, 2010, Plaintiff was assessed a GAF score of 71. (Tr. at 537, 542.) On August 9, 2010, Plaintiff was assessed a GAF score of 70. (Tr. at 546.) On August 11, 2010, Plaintiff was assessed a GAF score of 65. (Tr. at 549.)

On June 16, 2010, Dr. Dennis Treece completed a one-page "medical needs report" form for the State of Michigan Department of Human Services wherein he concluded that due to fibromyalgia, Plaintiff has a medical need for assistance in meal preparation, shopping, laundry,

---

[4]Twice in the medical record it is stated that Plaintiff was given a prescription for "Zantac 0.5 mg tablet[s]" to be taken up to three times a day for anxiety. (Tr. at 398.) This is believed to be a transcription error, as Zantac is an over the counter medication used to treat heartburn and each tablet is 150 mg. "Xanax" is an anti-anxiety medication and a typical dosage is 0.5 mg. (*See* www.drugs.com/xanax.html)

11

and housework, and concluded that Plaintiff cannot work at a usual occupation nor can she work at any job. (Tr. at 451.)

Plaintiff indicated on her Adult Function Report that she wakes her children up, drops them off at school, attends college classes from 8:00 a.m. to 1:00 p.m. from Monday through Thursday, helps her children with their homework, has no problem with personal care, prepares complete meals daily for three to four hours, does cleaning and laundry for three to five hours per week, rides in cars and uses public transportation, reads, plays cards, socializes on a daily basis, does not need reminders and does not need anyone to accompany her, can walk two blocks before needing to rest for "[a]bout 10-15 minutes," and can pay attention "all day." (Tr. at 216-21.)

At the administrative hearing, Plaintiff testified that she lives with her three children in a two-story home, that her bedroom is on the first floor, and that the laundry facilities are in the basement. (Tr. at 63.) At the time of the hearing, Plaintiff's children were 21, 13, and 6 years old. (Tr. at 63-64.) Plaintiff indicated that she earned $9,800 babysitting her neighbor's child from 2007 to September of 2008. (Tr. at 64-65.) Therefore, the alleged onset date was amended to October 16, 2008. (Tr. at 65.) Plaintiff testified that she cannot "sit for a long period of time," "can't stand for a long period of time," and that she has "chronic universal pain that's all over that some days are very debilitating that I can't get up and do normal household work and basically it has me sometimes when it's the worst pain I'm bed ridden." (Tr. at 67.) When asked for more specific information, Plaintiff indicated that she can sit for "[l]ike 20 minutes[,]" can stand for 10 minutes, and can walk for "less than half a mile" at a time and can lift "[l]ess than 10 pounds," but "[p]robably" could lift a gallon of milk. (Tr. at 74-75.)

Plaintiff testified that she is bed ridden "[l]ike four times out of a week." (Tr. at 68.) Plaintiff testified that she is able to shower but cannot shop or do housework by herself and that she has not had a driver's license since 2001. (Tr. at 69-70.) Plaintiff stated that she does not do any laundry or house cleaning and only shops with the "aid of my son or with a friend." (Tr. at 70-71.) Plaintiff stated that her oldest child gets the younger children to school and helps with

12

homework, and that she does not help at all nor does she engage in any social activities. (Tr. at 71-72.)

Plaintiff testified that she "use[d] to go to school" and, when asked by the ALJ when she stopped, she indicated that she "stopped this semester." (Tr. at 72.) She stated that she had been taking college biology, sociology and philosophy classes and that she flunked biology, passed sociology with a "B" grade and withdrew from the philosophy class. (Tr. at 73, 84.) Plaintiff explained that she dropped the class because the "instructor was volatile . . . [t]he minute he came in the tension was so thick you could cut it with a knife and it just, I couldn't concentrate." (Tr. at 83.) During the previous semester she had taken four classes; she failed English but passed her corrections, mathematics and American government classes. (Tr. at 73-74.) When asked by her attorney, Plaintiff indicated that she had difficulty sitting through her classes and that her "knees would lock up if I'm sitting like I'm sitting now" and that her "back would begin to hurt and I'd have to get up and go stretch out or try to change my position in my seat so I would be comfortable." (Tr. at 78.) Plaintiff indicated that her "main pain is my back and knees." (Tr. at 80.) Plaintiff also stated that she had "anxiety" when other students would talk about things that didn't pertain to the subject of the class. (Tr. at 80.) Plaintiff stated that she missed classes because of "the depression" where she "just want[s] to sleep." (Tr. at 81.) Plaintiff indicated that she had a "real bad" "panic attack" in January 2012 and an EMS unit was called. (Tr. at 82.) Plaintiff stated that she has panic attacks outside the home and while at home. (Tr. at 82-83.) Plaintiff sees her therapist every two weeks and her psychiatrist every few months. (Tr. at 75.) Plaintiff also stated that she uses a computer to send and receive e-mail and is on Facebook. (Tr. at 76.) Plaintiff stated that she has fatigue, nausea, and constipation as a result of the HIV medication. (Tr. at 87.)

At the administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider an individual with Plaintiff's background who

> can perform work at the sedentary level. Would require a sit/stand at will option; no climbing ladders, ropes or scaffolds; only occasionally climbing ramps or stairs, balance, stoop, crouch, kneel and crawl, okay? No constant rotational flexion extension of the neck; only occasional overhead reaching and handling; avoiding concentrated exposure to extreme cold, heat, wetness and humidity. Avoiding

13

> concentrated exposure to excessive vibration, environmental irritants and poorly ventilated areas. Avoiding use of moving machinery and all exposure to unprotected heights. Work would be limited to low stress, defined as having only occasional decision making and only occasional changes in the work setting. No interaction with the general public and only occasional interaction with co-workers and with no tandem tasks.

(Tr. at 89-90.) The VE responded that such a person could not perform Plaintiff's past relevant work but could perform the 1,000 surveillance system monitor jobs and the 1,000 production inspector or checker/sorter jobs available in Southeastern Michigan. (Tr. at 91.)

### F. Analysis and Conclusions

#### 1. Legal Standards

The ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 43-51.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

S.S.R. 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

#### 2. Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 9.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even

14

where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's RFC analysis and finding that Plaintiff did not meet or equal Listing 12.04 were in error because the ALJ improperly discounted Dr. Boneff's findings and because, although the ALJ indicated he gave controlling weight to Dr. Bell's opinion, he nevertheless found Plaintiff did not meet the Listing and was not disabled. (Doc. 9 at 13-16.) Plaintiff also argues in her reply brief that the ALJ did not offer sufficient reasoning for his conclusion regarding the Listing and that such failure prevents meaningful judicial review. (Doc. 15 at 5.) In addition, Plaintiff argues that the ALJ cited a GAF score of 63 when Dr. Bell actually reported a substantially lower GAF score of 53. (Doc. 9 at 16-17.)

> Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." [20 C.F.R.] § 404.1525(c)(3). A claimant must satisfy all of the criteria to meet the listing. *Id.* Under section 12.04 (Affective Disorders), for example, the so-called A criteria are satisfied by medical documentation of bipolar syndrome with a history of episodic periods. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. . . . The B criteria [] are satisfied by a showing of at least two of the following functional limitations: 1) a marked restriction of activities of daily living, 2) marked difficulties in maintaining social functioning, 3) marked difficulties in maintaining concentration, persistence, or pace, or 4) repeated episodes of decompensation, each of extended duration. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC and move on to steps four and five.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). In *Rabbers*, the Sixth Circuit held that the plaintiff's bipolar disorder did not seriously interfere with his ability to function on a daily basis where his daily activities were self-described as watching television, visiting a soup kitchen, doing some household chores and attending NA or AA meetings. *Id.* at 658.

I first suggest that the ALJ did explain his reasoning as to why Plaintiff did not meet Listing 12.04 and that he adequately did so. (Tr. at 41-42.) Furthermore, I suggest that Plaintiff's self-described daily activities show even more functioning than the plaintiff in *Rabbers*. Plaintiff indicated in her activity report that she wakes her children up, drops them off at school, attends college classes from 8:00 a.m. to 1:00 p.m. from Monday through Thursday, that she helps her

15

children with their homework, has no problem with personal care, prepares complete meals daily for three to four hours, does cleaning and laundry for three to five hours per week, rides in cars and uses public transportation, reads, plays cards, socializes on a daily basis, does not need reminders and does not need anyone to accompany her, and can pay attention "all day." (Tr. at 216-21.) I therefore suggest that the ALJ properly determined that Plaintiff has not shown that her mental impairments markedly restrict her daily activities. (Tr. at 41.)

As to social functioning, the Court in *Rabbers* held that where Plaintiff had anger management problems, and was not a "people person," but got along with most of his family, the evidence did not show that his disorder interfered with his ability to maintain social functioning. *Rabbers*, 582 F.3d at 659. I suggest that the same is true in the instant case. Plaintiff's psychiatric evaluator, Dr. Sheth, noted that Plaintiff was moderately limited in maintaining social functioning, but when he completed the more detailed report, although he found Plaintiff was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, he also found that Plaintiff was otherwise not significantly limited in social interaction. (Tr. at 376, 381.) In addition, Dr. Sheth also concluded that Plaintiff retains the mental functional capacity to do simple, unskilled work on a sustained basis. (Tr. at 378, 382.) I suggest that the record evidence demonstrates that the ALJ properly found that Plaintiff's depression, which is manifested in mood swings that make her difficult to get along with, did not seriously interfere with her ability to maintain social functioning. (Tr. at 42.)

There is no evidence in the instant case that Plaintiff suffers marked difficulties in concentration, persistence or pace; instead, the evidence agrees with the ALJ's conclusion that Plaintiff has moderate difficulties with regard to concentration, persistence or pace. (Tr. at 42.) Dr. Sheth concluded that Plaintiff was moderately limited in maintaining concentration, persistence or pace, and in the more detailed analysis, found Plaintiff to be moderately limited in her ability to understand and remember detailed instructions and her ability to maintain attention and concentration for extended periods, but that Plaintiff was otherwise not significantly limited in understanding, memory or sustained concentration and persistence. (Tr. at 376, 380-81.)

However, as noted above, Dr. Sheth also concluded that Plaintiff retains the mental functional capacity to do simple, unskilled work on a sustained basis. (Tr. at 378.)

As to the fourth and final functional area, there is no evidence or argument that Plaintiff suffered episodes of decompensation. Since I suggest that Plaintiff cannot show even one, let alone two, functional limitations to satisfy the "B" criteria, I suggest that the ALJ properly found that Plaintiff did not meet Listing 12.04. *See Lee v. Comm'r of Soc. Sec.*, ___ F. App'x ___, 2013 WL 3388486, at *5 (6th Cir. July 9, 2013) (where the plaintiff could prepare meals, do laundry, shop and pay bills, and occasionally spent time with others, daily activities and social functioning portions of the Listing were not met or equaled, and since the plaintiff was less than markedly limited as to concentration and had no episodes of decompensation, the plaintiff could not meet or equal Listing 12.04).

As to Plaintiff's other arguments, I suggest that they do not undermine the above conclusion. As to the contention that the ALJ improperly discounted Dr. Boneff's findings, Dr. Boneff is an examining source, not a treating source, and therefore his opinion is not entitled to controlling weight. *See Cole v. Comm'r of Soc. Sec.,* 652 F.3d 653, 660 (6th Cir. 2011). In addition, I suggest that the ALJ's findings are not inconsistent with Dr. Boneff's findings; thus, the ALJ did not discount it, let alone improperly discount it. Dr. Boneff noted that Plaintiff "answered questions in a logical, goal-directed fashion for the most part" and opined that Plaintiff "would seem to be capable of engaging successfully in work-type activities at her level of cognitive complexity." (Tr. at 334-35.)

As to Plaintiff's argument that the ALJ's conclusion that Plaintiff did not meet Listing 12.04 is somehow inconsistent with Dr. Bell's opinion or that the ALJ misstated the GAF scores attributed to Plaintiff by Dr. Bell, I suggest that these arguments also fail to undermine the ALJ's conclusion. (Doc. 9 at 13-16.) Dr. Bell consistently noted that Plaintiff's judgment and insight were good, her memory was intact, and her thoughts were logical and coherent. (Tr. at 474-552.) In addition, Dr. Bell assessed GAF scores ranging from 53 to 71, specifically 53, 60, 63, 65, 67, 70 (twice), and 71. (Tr. at 490, 494, 531, 534-35, 537, 542, 546, 549.) I suggest that even if the

17

ALJ relied on a GAF score of 63, such a score is just short of the mean score of 64 and would not be inappropriate. Regardless, the Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted) (finding that increase in GAF score from 55 to 60 was insignificant). The GAF scores, therefore, are not raw medical data and do not necessarily indicate improved symptoms or mental functioning. Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See also Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

I further suggest that the ALJ's findings also follow the opinions of the vocational expert which came in response to detailed and proper hypothetical questions that accurately portrayed Plaintiff's individual impairments in harmony with the relevant objective record medical evidence. *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

For all these reasons, after review of the relevant record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice

within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

 s/ **Charles E Binder**
 CHARLES E. BINDER
Dated: July 25, 2013  United States Magistrate Judge

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date: July 25, 2013 By s/Patricia T. Morris
 Law Clerk to Magistrate Judge Binder